14

UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF MICHIGAN

**Grace Ellis Adams**
829 Langdon Court
Rochester Hills, MI 48307
(248) 651-7758,
      **Plaintiff**

v.

**WILMINGTON FINANCE**
1595 Spring Hill Road, Suite 310,
Vienna, VA 22182

**AIG FEDERAL SAVINGS BANK**
**Chief Compliance Officer**
600 King Street,
Wilmington, DE 19801
Phone: (302) 661-8969

**U.S. BANK**
205 West 4th Street,
Cincinnati, OH 45202
Phone: (800) 344-5016

**AMERIMORTGAGE**
2600 5 Mile Road,
Grand Rapids, MI 49525
      **Defendants**

Case: 2:07-cv-15494
Judge: Cox, Sean F
Referral MJ: Majzoub, Mona K
Filed: 12-27-2007 At 04:37 PM
cmp ADAMS V. WILMINGTON FINANCE, ET AL (TAM)

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DISCRIMINATION, FRAUD AND DECEPTION, AND RETALIATION

**COMES NOW** Plaintiff, Grace Ellis Adams seeks assistance under the AIG/OTS Settlement and to recover money damages from the Defendants for Discrimination, Fraud, and Deception, and Retaliation by the Defendants Amerimortgage, Wilmington Finance/AIG and U.S. Bank

### I. JURISDICTION

1. Jurisdiction of this Court is based on Diversity of Citizenship. The amount in controversy exceeds $75,000.00.

## II. PARTIES

2. Plaintiff, Grace Ellis Adams, is a single, divorced African American woman who resides in Rochester Hills, Michigan.

3. Defendant, Wilmington Finance, a division of AIG Federal Savings Banks is a mortgage lender, whose address is 1595 Spring Hill Road, Suite 310, Vienna, Virginia 22182.

4. Defendant, U.S. Bank is a mortgage lender and loan servicer, whose main place of business is 205 West 4th Street, Cincinnati, Ohio 45202.

5. Defendant, Amerimortgage Corporation is a loan broker whose main address is 2600 5 Mile Road, Grand Rapids, MI 59505

## III. STATEMENT OF CLAIM

6. Plaintiff is a borrower similarly situated and with the same circumstances as the borrowers listed in the AIG-FTC June 2007 settlement. Plaintiff, a divorced, 54 year old, African-American woman who was targeted by Amerimortgage and Wilmington Finance, a division of AIG Federal Savings Bank and steered into a loan she could not afford to repay. Amerimortgage and Wilmington targeted the Plaintiff and other underserved African American borrowers with their ARM loan program and charged them higher interest fees and rates.

**RELEASE**: **June 8, 2007 OTS Executes Supervisory Agreement with AIG FSB. . . Washington, D.C.** — The Office of Thrift Supervision (OTS) announced today the execution of a Supervisory Agreement with AIG Federal Savings Bank (AIG FSB) for its **failure to manage and control in a safe and sound manner the loan origination services outsourced to its affiliate, Wilmington Finance, Inc. (WFI).** The Agreement addresses loan origination activities by WFI that had a negative financial impact on certain borrowers of AIG FSB.

## IV. FRAUD AND DECEPTION

7. From on or around March 1, 2005 through December 1, 2005, like a blitz, Plaintiff started receiving calls morning and evening from brokers mostly foreign speaking agents telemarketing for brokers regarding refinancing her fixed rate mortgage to a lower rate.

Plaintiff was told by the telemarketers that she could get a lower rate because interest rates were low.

8. On or about December 1, 2005, Plaintiff spoke with an English speaking broker from Amerimortgage who promised Plaintiff a lower fixed interest rate and lower mortgage payment if she agreed to refinance. That a refinance would be with no closing costs and fees. That Plaintiff had nothing to loose.

9. Plaintiff explained to the Amerimortgage broker that she had credit challenges and was not employed, but the broker assured Plaintiff on more than one occasion that Amerimortgage could provide her with a no cost refinance with a lower interest rate. That at the most Plaintiff would have to pay for appraisal and documentation only. That Plaintiff should not wait but take advantage now as their lenders are ready and willing to loan money. That the Feds would be tightening credit soon and the lenders would no longer be able to loan money. That quite soon it would be hard to nearly impossible for not only the Plaintiff with credit challenges, but everyone to get a loan.

10. Plaintiff told the Amerimortgage broker that she was not working; that her credit was seriously challenged because of a divorce, and that her only steady source of income was $500.00 a month in alimony. Plaintiff was then asked how much equity she had and was then told by the broker that Amerimortgage could and would do whatever was necessary to get Plaintiff a lower interest rate and loan than what Plaintiff was paying. That Plaintiff should at least let them run her credit. That in most cases her credit probably was not be as bad as she thought and their lenders at the time were more interested in loaning money than Plaintiffs credit challenges.

11. Plaintiff was asked by the broker if she knew what her credit score was and when she told the broker around 500 she was told by the Amerimortgage broker that 500 was not to bad since Plaintiff had a lot of equity in the property. That they should have no problem with a loan for Plaintiff because her bruised credit. That after explaining to the Lender about Plaintiffs divorce they should have no problem getting Plaintiff a loan at a lower rate and monthly payment. That Amerimortgage had available all types of loan programs better than what Plaintiff had.

12. After Plaintiff allowed Amerimortgage to run her credit and Plaintiff discussed her credit score with the broker the phone calls from the other brokers suddenly stopped. Plaintiff

was told by the Amerimortgage broker that her credit score was really not that bad, just needed cleaning up. That the fact that Plaintiff was not working and had some credit challenges was not an issue. That even with Plaintiff's credit challenges, they could still get Plaintiff a loan with a lower rate than what she had. That they had several programs that Plaintiff would qualify for, bruised credit and all, and that they would help Plaintiff to get much of the derogatory information off her credit report. That since Plaintiff had a lot of equity in her home the lenders would be more lenient to loan her money and at a lower interest rate. That Plaintiff would need to go ahead though and get an appraisal of the property so they could move forward.

13. Plaintiff suggested to the broker that the appraisal cost be added in the cost of the loan and paid at closing, but was told Amerimortgage could not do that. That Plaintiff would have to pay upfront to get the appraisal done so that they could move forward to get her a lower rate and mortgage payment. That they could not even approach a lender to consider her loan without first getting an appraisal of the property.

14. After about a week after Plaintiff was steered into arranging and paying for an appraisal of her property she was told by the broker that Plaintiff and Amerimortgage needed to work on removing the derogatory information from her credit and that they would help her.

15. Once Plaintiff and broker began contacting agencies and removing old liens and other derogatory information from Plaintiffs credit report is when the broker told Plaintiff that she had the right program for Plaintiff. That an Adjustable Rate Mortgage (ARM) was Plaintiffs best bet. That with an ARM and the interest rates predicted to drop to an all time low Plaintiff's interest on an ARM and her mortgage payments should drop, and if not at the least in a few years she could always go back to a fixed mortgage.

16. When Plaintiff told the broker she was not interested in or familiar with an ARM, that it sounded like gambling, Plaintiff was assured by the broker that an ARM was a safe investment as the interest rates were guaranteed to go down and not up. That Plaintiff could always switch back to a fix rate loan in a few years if the interest rate does in fact go up instead of down which the broker doubted. That Plaintiff could refinance again if the ARM went up instead of down.

17. When Plaintiff insisted she did not want an ARM and did not understand an ARM, the Amerimortgage broker told her that she would continue to contact lenders to find a lower fixed rate than what Plaintiff already had.

18. After few days had passed when Plaintiff received a call from the broker saying that she had been busy and may have to put Plaintiff in an ARM, and that even if they had to put Plaintiff in an ARM to get a lower interest rate; that it would also guarantee Plaintiff a lower interest rate in the future as interest rates were steady dropping. That the broker was still trying to find a fixed rate with a low interest rate for Plaintiff.

19. After a few days or so Plaintiff received another call from the broker to say that the best she had was the ARM at 8.55. That she would still try to get a better rate on the ARM. That although she knew Plaintiff was not interested in an ARM, Plaintiff would be better off with the ARM and guaranteed a lower interest rate shortly as the rates were steady dropping.

20. The Amerimortgage broker never offered Plaintiff any other options except an ARM. Neither the broker nor the lender Wilmington Finance ever requested proof of income or employment from Plaintiff. Plaintiffs' home mortgage with Wilmington Finance on January 6, 2006 was not based on her ability to repay the loan but was based on the equity in her home rather than her ability to pay.

21. After the mortgage closing Plaintiff was shocked when she received a letter from U.S. Bank on or around February 10, 2006, about a month after closing that they were the servicer of the new loan and that the lender, Wilmington Finance had decided to change her loan, an ARM at 8.55% to a 30 year fixed mortgage at 8.55% instead of the ARM Plaintiff had already been steered in to by the broker. The Defendant Amerimortgage never did tell Plaintiff that the ARM they were suggesting was set to rise to 10.32 percent in two years.

22. As a result of the Defendant's dubious lending practices Plaintiff has been trapped in a high-cost mortgage she can not afford. Plaintiff never received disclosure statements regarding the fixed rate before or at the closing. Plaintiff was under the impression at the closing she had an ARM.

23. Plaintiff was rushed at a closing that took about 15 to 20 minutes and never noticed she was signing a Fix Rate mortgage. Plaintiff did notice the higher loan payment amount

did not include taxes which Plaintiff had requested be included in her monthly payment Plaintiff tried calling the broker but was unable to reach the broker and was told by the notary all she could do would be to cancel the closing until another day which may take another couple of weeks to reschedule depending on the broker and lender and what we had to be worked out.

24. The Defendants Amerimortgage and Wilmington Finance/AIG, also charged Plaintiff excessive mortgage interest fees along with the higher 8.55 percent interest rate after telling Plaintiff the ARM would lower her current interest and mortgage payments and that her loan would be a no-cost refinance.

25. The Defendant Amerimortgage coerced Plaintiff into a hostile environment when they tried charging Plaintiff upwards of $10,000.00 in fees for processing before the closing. When Plaintiff complained they removed the brokers fees, but Plaintiff noticed after the closing they added the fees back in.

26. About a month after closing Plaintiff received a letter from U.S. Bank explaining to Plaintiff that they were the servicer of her new loan and that the lender had changed the loan to a fixed rate loan. Plaintiff never noticed at the closing that she had a fixed rate and the Defendant Amerimortgage never told Plaintiff that they had switched her loan from an ARM to a fixed rate.

27. Plaintiff was targeted and noticed even now while examining her closing documents that the broker Amerimortgage, nor the lender Wilmington Finance, never reported the HMDA data associated with the loan as is required to be reported to the Federal Government (HMDA).

28. The Defendants never asked to see Plaintiff's tax statements or proof of income. The Defendants coersed Plaintiff into estimating sales from a book she was planning to publish to inflate her income to present to the lender. Plaintiff's loan application did not require tax statements or income verification and was not based on her ability to pay but was based solely on the equity in her home.

29. When Plaintiff finally requested a copy of the Defendants underwriting standards the Defendant U.S. Bank filed foreclosure proceedings against the Plaintiff.

**RELEASE: June 8, 2007 OTS Executes Supervisory Agreement with AIG FSB. . . Washington, D.C.** — The Office of Thrift Supervision (OTS) announced today the execution of a Supervisory Agreement with AIG Federal Savings Bank (AIG FSB) for its **failure to manage**

**and control in a safe and sound manner the loan origination services outsourced to its affiliate, Wilmington Finance, Inc. (WFI).** The Agreement addresses loan origination activities by WFI that had a negative financial impact on certain borrowers of AIG FSB.

## V. RETALIATION

30. On August 5, 2007, as a result of Plaintiff's request for assistance, complaint for fraud and request for the Defendants underwriting standards, the Defendants AIG/Wilmington Finance and U.S. Bank conspired together and fraudently published in the newspaper that Plaintiffs' home was being foreclosed on by the Defendants for no reason except she complained against the Defendants to several federal regulatory agencies.

31. As a result of Defendants filing the foreclosure notice Plaintiff started receiving phone calls and tons of mail from other brokers regarding the foreclosure of her home they saw in the paper.

32. The attorney the Defendants hired to represent them in the foreclosure posted a foreclosure notice on the front of Plaintiff's home without Plaintiffs knowledge. Plaintiff called the attorney representing the Defendants and was told the foreclosure was started and stopped the same day. That he didn't know why it was stopped but he received a call to stop it.

33. The next day after the bogus foreclosure attempt, Plaintiff spoke with U.S. Bank whom told Plaintiff that they decided to drop the foreclosure proceedings the same day they started it, and defer her loan for two months and that her home was not in foreclosure.

34. The next day U.S. Bank sent Plaintiff an agreement to sign agreeing to defer her mortgage which Plaintiff did not sign but ignored the after-the-fact document.

35. Plaintiff has suffered sore mentally for the last two years, been embarrassed and taxed financially as a result of loan origination activities by Amerimortgage, Wilmington Finance and U.S. Bank that has had a negative financial impact on her. Plaintiff has also been trapped in a high-cost mortgage she can not afford.

36. Plaintiff is a borrower that has been negatively affected by the loan origination and lending practices of Wilmington Finance (WFI) and AIG FSB and is at risk of losing her home in foreclosure.

## VI. SUMMARY

37. Amerimortgage and Wilmington Finance, practiced unsound lending and violated laws or regulations when they targeted and coerced Plaintiff into an Adjustable Rate Mortgage that she could not afford. (TILA)

38. Plaintiff told Defendant Amerimortgage in December, 2005, as well as about 15 to 20 other brokers that had started calling Plaintiff day and night early in 2005, that she probably didn't qualify for a loan because she was unemployed, had credit challenges due to a divorce, and that the only steady income she had was $500.00 in alimony. Neither Defendant, Amerimortgage or Wilmington Finance took in to consideration Plaintiff's credit history nor required any proof of income or tax statements from Plaintiff.

39. Amerimortgage lured Plaintiff with misrepresentations about fees and interest rates on their loans. Plaintiff was told that her total closing cost would be around $1,500.00 and that she would have an interest rate less than what she was paying, but the rate the Defendants gave her was higher 8.55 percent.

40. Amerimortgage, and Wilmington Finance practiced unsound lending and violated laws or regulations when they created a hostile environment and coerced Plaintiff to inflate her income to get a loan after she had been steered into paying $250.00 for an appraisal of her property.

41. Amerimortgage charged Plaintiff well over $6,000.00 in closing fees after they promised her a no-fees, no points loan. Amerimortgage told Plaintiff on several occastions they were not charging Plaintiff points or commissions. That the broker was not collecting any commission on her loan; that sometimes that is the way it is; that she just wanted to help Plaintiff get the loan.

42. Amerimortgage practiced unsound lending and violated laws or regulations when they failed to tell Plaintiff that her taxes were not included in the payment which she had told them she wanted to be included in her mortgage payment.

43. Amerimortgage also used high-pressure tactics to rush Plaintiff through their loan closing without fully explaining their ARM program to Plaintiff. Most of the closings took less than 30 minutes because the notary they sent to Plaintiff's home for the closing knew nothing about the loan.

44. Amerimortgage, and Wilmington Finance practiced unsound lending and violated laws or regulations when they failed to explain the real risk of their ARM program when Plaintiff told them she knew nothing about it.

45. Wilmington Finance, and U.S. Bank practiced unsound lending and violated laws or regulations when they changed the loan terms of the mortgage from an ARM to a fixed mortgage loan without consulting the Plaintiff, at or before the closing.

46. Wilmington Finance, and U.S. Bank practiced unsound lending and violated laws or regulations when they started a foreclosing proceedings against Plaintiff on August 5, 2007, then stopped the foreclosure proceedings the same day in retaliation because Plaintiff sought assistance from the AIG/OTS Settlement Agreement to help borrowers adversely affected by their abusive lending practices.

47. Wilmington Finance, and U.S. Bank practiced unsound lending and violated laws or regulations when they deferred Plaintiff's mortgage without consulting her on or around August 5, 2007.

**WHEREFORE** Plaintiff ask my lord the Honorable Court for an injunction against the Defendants to stop all their fraudulent behavior against the Plaintiff, and charge the Defendants with Fraud and Deception, Discrimination, and Retaliation and award Plaintiff relief and assistance under the AIG/OTS Settlement and $860,000.00 for damages she suffered as a result of the Defendants actions.

Dated: December 27, 2007

By _____
Grace Adams
829 Langdon Court
Rochester Hills, MI 48307
(248) 651-7758

Cc: Mr. Martin Flumenbaum, Attorney for Plaintiff, AIG
    Phone: (212) 373-3000   Fax: (212) 757-3990

   Mr. Phillip Gamma, Bureau of Consumer Fraud, New York Attorney General
   Phone: (212) 416-8300   Fax: (212) 416-6003

   Mr. Randy W. Thomas, Special Counsel/Ombudsman,
   Office of Thrift Supervision (OTS)
   Phone: (202) 906-7945   Fax: (202) 906-6260

Mr. Richard Denby, Office of the Thrift Supervision (OTS)
Phone: (201) 413-7316 Fax: (201) 413-7541

Federal Trade Commission   Fax: (202) 326-2012

**RELEASE**: **June 8, 2007 OTS Executes Supervisory Agreement with AIG FSB. . . Washington, D.C.** — The Office of Thrift Supervision (OTS) announced today the execution of a Supervisory Agreement with AIG Federal Savings Bank (AIG FSB) for its **failure to manage and control in a safe and sound manner the loan origination services outsourced to its affiliate, Wilmington Finance, Inc. (WFI).** The Agreement addresses loan origination activities by WFI that had a negative financial impact on certain borrowers of AIG FSB.

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2007, I mailed a copy of Plaintiff's Complaint and Petition to Proceed Former Pauperus to the Defendants, Wilmington Finance, 1595 Spring Hill Road, Suite 310, Vienna, VA 22182, AIG Federal Savings Bank, Chief Compliance Officer, 600 King Street, Wilmington, DE 19801, U..S. Bank, 205 West 4th Street, Cincinnati, OH 45202 and Amerimortgage Corporation, 2600 5 Mile Road, Grand Rapids, MI 49525

Dated: December 27, 2007

Submitted by: _____
Grace Ellis Adams, in Pro se

# AFFADAVIT

STATE OF _Michigan_

COUNTY OF _Oakland_

    This day personally appeared before me, the undersigned authority in and for said County and State, GRACE ELLIS ADAMS, who being by me first duly sworn, says on oath that the matters and things contained in the above and foregoing Petition and Notice are true and correct as therein stated.

_____
Grace Ellis Adams

**SWORN TO AND SUBSCRIBED BEFORE ME**, this the 27th day of December..

_____
Notary Public

MARTHA V. ROSS
Notary Public, Wayne County, MI
Acting in _____ Co., MI
My Commission Expires 08/25/2008

My Commission Expires: _____

**JS 44** (Rev. 11/04)                                **CIVIL COVER SHEET** County in which this action arose _Oakland_

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Grace Adams

### DEFENDANTS
Wilmington Finance/AIG
U.S. Bank
Ameriquest Mortgage

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS — PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☒ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Case: 2:07-cv-15494
Judge: Cox, Sean F
Referral MJ: Majzoub, Mona K
Filed: 12-27-2007 At 04:37 PM
cmp ADAMS V. WILMINGTON FINANCE, ET AL (TAM)

Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
...tionment
...inking
...fluenced and ...nizations
...redit
...v
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

### V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): _TILA, HmDA_
Brief description of cause: _Discrimination, Fraud and Deception and Retaliation_

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _860,000.00_
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE _____ SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed? ☐ Yes ☑ No

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.) ☐ Yes ☑ No

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____

Notes: